BOOTH BOTTOMLY *vs.* SAMUEL CHISM & another.

The Rev. Sts. *c.* 116, § 2, (Gen. Sts. *c.* 149, § 2,) gave C., a millowner, no right to flow back the water of a stream by building his dam so as to injure an existing dam higher up the stream or to obstruct the clearing or repairs of the gateway therein, though such upper dam was used only to create a reservoir for a mill below C.'s dam; and on the sale of this mill to one and of the upper dam to another, and the erection of a mill at the upper dam after the building of C.'s dam, the owner of the upper mill and dam continues to be protected against a flowing back by C. to the same extent as before, though to no greater extent.

BILL IN EQUITY to restrain the defendants from flowing back the water of Kettle Brook in Leicester, so as to impede the working of the plaintiff's mill situated higher up the stream. An issue was framed for a jury, whether the defendants threatened to flow back the water so as to raise the brook higher than they had a right to do. At the trial of the issue in this court, before *Ames,* J., it appeared that the Bottomly Manufacturing Company in 1827 built the dam now owned by the plaintiff, and at that time also owned a mill and dam about half a mile lower down the stream; that the upper dam was used by the company only for the purpose of making a reservoir or feeding pond for the mill below; that in 1849 the company conveyed the lower dam and the mill to Joel Hodges, and in 1850 conveyed the upper dam to the plaintiff. The plaintiff's mill at the upper dam was begun in 1848, and completed in 1851. The other facts are stated in the opinion.

The jury found that the defendants had threatened to raise the brook higher than they had a right to do; and the defendants alleged exceptions.

*H. Williams*, for the defendants.

*G. F. Hoar*, for the plaintiff.

CHAPMAN, C. J. The plaintiff's grantors built his dam in 1827, on their own land. Half a mile below it they had a mill and dam on their own land, and used the upper dam to create a reservoir and feeding pond, drawing it down from day to day at their pleasure till 1851. Between these two dams there was land which belonged to other persons, and which had dams and mills upon it. They were built before the upper dam and were in use, but no question arises as to them. A saw mill was built near the upper dam in 1833, under the authority of the plaintiff's grantors, and continued in operation till 1838, but it was so situated that no question arises in regard to it, nor are the rights of the present parties affected by it.

In 1848 the plaintiff's grantors commenced building another mill near the site of the saw mill, and it was completed in 1851, and is now in operation. The plaintiff complains that the defendants obstruct the working of this mill by means of a dam, erected on the defendants' land, a little below this mill, and which causes the water to flow back upon it.

But the defendants' dam was erected in 1836; and in 1837 a mill was erected in connection with it, which has been in operation ever since. This occupation of the water power being prior to the erection of the plaintiff's mill, the defendants contend that their right of flowage under the mill act cannot be affected by the erection of the plaintiff's mill. In this they are correct.

The defendants' mill was erected while the Revised Statutes were in force. By *c.* 116, § 2, their grantors were authorized to flow the land of the plaintiff's grantors unless it should be " to the injury of any mill lawfully existing, either above or below it, on the same stream, or to the injury of any mill site on the same stream on which a mill or mill dam shall have been lawfully erected and used, unless the right to maintain a mill, on

such last mentioned site, shall have been lost or defeated by abandonment or otherwise."

All that the plaintiff's grantors had which was protected against the defendants' right of flowage under this act was the reservoir and feeding dam, which was used, as stated above, in connection with the mill below. It does not appear that they had any such prescriptive right in respect to the stream between their upper dam and their mill as existed in the case of *Brace* v. *Yale*, 10 Allen, 441. But no material question arises on that point.

As connected with a mere reservoir and feeding pond, drawn down from day to day at their pleasure to supply power to their mill below, the dam and gateway which regulated the supply constituted an essential part of the mill; and the court are of opinion that the statute did not authorize the defendants to obstruct the use of the dam and gateway in connection with the mill to which the structure belonged, it being in existence when the defendants' mill and dam were erected.

But the method of using the water of this pond in connection with the mill below was, as is apparent from the bill of exceptions, to shut the gate at night and allow the pond to get full, and to open the gate the next day and thus draw the water down. It is obvious that, in the early part of the day, when the pond was full, the defendants' pond might flow back upon the gateway without obstructing the flow of the water through it to the same extent as when the pond was drawn off; but it would obstruct the removal of rubbish which might lodge there, and the making of repairs which might be necessary. And it would be impossible for a jury, called to estimate damages, to determine during what hours of the day the flowing might be permitted. We think, therefore, that the statute did not give the defendants a right to flow the plaintiff's land to such an extent as to obstruct the passage of water through his gateway during any part of the day or year.

The plaintiff's present mill, built near the upper dam, is not further protected against the defendants' right to flow by virtue

of the statute, than it is incidentally protected by the rights belonging to the gateway; and thus far it is protected.

The rulings were in conformity with these principles.

*Exceptions overruled.*